HALF MOON BAY FISHERMANS' MARKETING ASSOCIATION, Steve Fitz, James Matkin Buskirk, Michael McHenry, John Szostak, Harold Janniro, Steve Trusso, and Don Dodson, Plaintiffs–Appellants,

v.

Frank CARLUCCI, in his capacity as Secretary of Defense, John O. Marsh, Jr., in his capacity as Secretary of the Army, Lt. General E.R. Heiberg, III, in his capacity as Commanding General of the Army Corps of Engineers, the United States Army Corps of Engineers; Port of Oakland, and the Board of Port Commissioners, Defendants–Appellees.

No. 88–2606.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1988.

Decided May 27, 1988.

Amended June 3, 1988.

Second Amended Sept. 15, 1988.

Roger Beers and Cynthia Koehler, San Francisco, Cal., for plaintiffs-appellants.

Francis B. Boone, Asst. U.S. Atty., San Francisco, Cal., for federal defendants-appellees.

Charles S. Barquist, Morrison & Foerster, San Francisco, Cal., for defendants-appellees Port of Oakland and Bd. of Port Com's.

Before HUG, BRUNETTI and NOONAN, Circuit Judges.

BRUNETTI, Circuit Judge:

The plaintiffs, Half Moon Bay Fishermans' Marketing Association ("the Association") and individual fishermen, brought this action to challenge the Army Corps of Engineers' ("the Corps") and the Port of Oakland's decision to dump 500,000 cubic yards of dredged materials from Oakland's Inner Harbor Channel into the area of ocean water off Half Moon Bay known as site B1. The 500,000 cubic yards at issue in this case represent the minimum initial dredging effort necessary to deepen Oakland's Inner Harbor Channel from 35 feet to 38 feet and to construct an 1100 foot diameter, 38 foot deep turning basin, and thereby accommodate the first super containership scheduled to arrive in Oakland on June 10, 1988.

This initial dredging effort represents only 7% of the total 7 million cubic yards of material authorized to be dredged as part of the Oakland Harbor Navigation Project. See Water Resources Development Act of 1986, Pub.L. No. 99–662. The purpose of the project is to provide adequate depth and safety in Oakland Harbor to accommodate the new super containerships currently being used in the Pacific Rim trade. The project authorizes deepening both the Inner and Outer Harbor channels to 42 feet below mean lower low water ("MLLW") channel depth to accommodate these vessels, and as a result, requires the removal of approximately 7 million cubic yards of material.

On May 5, 1988, the district court denied the plaintiffs' application for a temporary restraining order. By stipulation of counsel, this proceeding was treated as the hearing on a motion for a preliminary injunction, which was also denied. The plaintiffs now ask this court to issue an injunction pending appeal, on an emergency basis, in order to restrain the defendants from commencing the dumping of the dredged materials at site B1.[1]

■ If we deny the requested injunctive relief pending appeal, the defendants will begin dumping the dredged material immediately, thereby mooting the plaintiffs' appeal of the district court's decision. Therefore, because the "denial of an injunction pending appeal will effectively dispose of the appeal ... we decide the appeal on its

---

1. Although the plaintiffs have referred to the ocean disposal site at issue as site B1, the Army Corps of Engineers' Record of Decision, which represents the final decision, designates site B1B as the ocean disposal site. Site B1B is located between site B1 and B1A. Up until the time the Corps circulated its Record of Decision, it appears that site B1, not site B1B, was being considered. Because of the close proximity between sites B1 and B1B, we assume that the plaintiffs' present challenge to use of site B1 is, in fact, a challenge to use of site B1B, and that the plaintiffs' arguments against use of site B1 apply equally to use of site B1B.

merits." *Matsumoto v. Pua*, 775 F.2d 1393, 1395 (9th Cir.1985).

## I. *Standard of Review*

■ Our review of the district court's denial of the plaintiffs' motion for a preliminary injunction is constrained by a deferential standard of review. Our role is to determine whether the district court employed the proper legal standard in denying the injunction and whether it abused its discretion in applying that standard. *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). In this circuit, the proper legal standard for denial of a preliminary injunction is whether the movant failed to establish "probability of success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardship tips sharply in its favor." *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir. 1987). These two legal standards "are not really two separate tests, but [rather] they are merely extremes of a single continuum." *Benda v. Grand Lodge of International Association of Machinists*, 584 F.2d 308, 315 (9th Cir.1978), *cert. denied*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). Additionally, "the critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Id.; accord, William Inglis and Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir.1975).

The lower court considered the plaintiffs' probability of success on the merits, the possibility of irreparable harm, as well as the balance of hardship, and on this basis, denied the plaintiffs' motion for a temporary restraining order or preliminary injunction. Because the district court used the proper legal standard when it denied the preliminary injunction, our only task is to determine whether the lower court abused its discretion in applying that standard.

We conclude that at this stage of the Oakland Harbor Navigation Project, the district court's denial of the plaintiff's motion for a preliminary injunction does not amount to an abuse of discretion. The defendants have minimally complied with Section 102(2)(C) of the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq* (1982), Section 103 of the Marine Protection, Research, and Sanctuary Act ("MPRSA"), 33 U.S.C. § 1413(a) (1986), and all regulations promulgated under these statutes, with regard to the initial dumping of 500,000 cubic yards of dredged materials at site B1B. Even this minimal degree of compliance with the applicable statutes and regulations diminishes the plaintiffs' likelihood of success on the merits. On the other side, the defendants' hardship resulting from delaying the dredging and dumping of material appears to outweigh the hardship to the plaintiffs in dumping material at B1B. Therefore, considering both the limited extent of this initial dredging and the limited extent of our review, we uphold the district court's denial of the plaintiffs' motion for a preliminary injunction.

## II. *Analysis*

### A. *Compliance with NEPA, MPRSA, and the applicable regulations.*

"The purpose of NEPA is to ensure that federal agencies are fully aware of the impact of their decisions on the environment." *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) (citation omitted). NEPA effectuates this purpose by requiring environmental impact statements for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C) (1982). All parties agree that the ocean dumping at issue here is a major federal action significantly affecting the quality of the human environment and that the following documents were prepared in this case: two final environmental impact statements ("FEIS") filed in 1981 and 1985, a draft supplement to the FEIS ("draft supplement") filed in September 1987, and a final supplement to the FEIS ("final sup-

plement") filed in March 1988. The parties, however, dispute whether these documents, particularly the draft supplement and final supplement, satisfy NEPA's requirements.

"NEPA is essentially a procedural statute." *Oregon Environmental Council v. Kunzman,* 817 F.2d at 492 (citation omitted). As a result, a district court will only set aside agency action if it was undertaken "without observance of the procedure required by law," Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (1982), or was "arbitrary, capricious, an abuse of discretion, or otherwise not according to law." *Oregon Environmental Council v. Kunzman,* 817 F.2d at 492 (citation omitted); see also 5 U.S.C. § 706(2)(A) (1982).

■ The reviewing court may not "flyspeck" an EIS, *Northwest Indian Cemetery Protective Association v. Peterson,* 795 F.2d 688, 695 (9th Cir.1986) (quotation omitted), or "substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). Instead, the reviewing court must follow a "rule of reason" and determine whether the EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* (quotation omitted). This review requires the district court to make a "pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Id.* If the agency has taken a "hard look" at a decision's environmental consequences, the decision must not be disturbed. *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976).

1. *Notice and Opportunity to Comment.*

■ The 1985 FEIS selected Alcatraz as the disposal site for the material dredged from the Oakland Harbor. However, the draft supplement modified this disposal plan. Instead of dumping the Oakland material directly at Alcatraz, the draft supplement proposed predredging material from

Alcatraz, disposing of it at a designated ocean disposal site, and then disposing of the Oakland dredged material at Alcatraz. Both sites B1 and 1M were listed in the draft supplement as potential ocean disposal sites for the material to be dredged from Alcatraz. However, the plaintiffs contend that the draft supplement did not provide adequate notice that site B1 was being considered as a potential disposal site because the draft supplement specifically stated that site 1M "has been selected as the appropriate disposal site for dredged material from the Oakland Harbor projects." The plaintiffs argue that the draft supplement's statement that site 1M had been "selected" did not put them on notice that site B1 was still actively being considered as a potential ocean disposal site, and as a result, they were deprived of the opportunity to comment on the use of site B1 as the designated ocean disposal site.

"NEPA's public comment procedures are at the heart of the NEPA review process" and reflect "the paramount Congressional desire to internalize opposing viewpoints into the decision making process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision." *California v. Block,* 690 F.2d at 770–71. It is only at the stage when the draft EIS is circulated that the public and outside agencies have the opportunity to evaluate and comment on the proposal. *Id.* at 771. "No such right exists upon issuance of a final EIS." *Id.* Consequently, an agency's failure to disclose a proposed action before the issuance of a final EIS defeats NEPA's goal of encouraging public participation in the development of information *during* the decision making process.

However, "agencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input," without having to circulate a supplemental draft EIS describing the proposed action. *Id.* The agency need not circulate a supplemental draft EIS if (1) "the alternative finally selected by [the agency] was within the range of alternatives the public could

have reasonably anticipated [the agency] to be considering," and (2) if "the public's comments on the draft EIS alternatives also apply to the chosen alternative and inform [the agency] meaningfully of the public's attitudes toward the chosen alternative." *Id.* at 772. If both of these criteria are established, the agency satisfies NEPA's goal of encouraging meaningful public participation during the decision making process without having to circulate a supplemental draft EIS.

The draft supplement identified and evaluated several potential ocean disposal sites, including sites 1M and B1, as alternatives to using the Alcatraz disposal site, selected in the 1985 FEIS. Although the draft supplement referred to site 1M as the "selected" site, the plaintiffs should have realized that the draft supplement was only a *draft*, i.e., necessarily preliminary in nature, and as a result, its conclusions were tentative at best. The only selection that could be made at this stage is the selection of a preferred site. Therefore, although the draft supplement's discussion of alternatives indicates that 1M was the preferred site, the alternative finally selected, site B1, was clearly within the range of alternatives the public could have reasonably anticipated the Army Corps of Engineers to be considering.

Additionally, the agency and public comments on the draft supplement's alternatives also apply to site B1, and as a result, informed the agency of the public's attitudes toward using site B1. After the draft supplement was circulated, the Army Corps of Engineers held public meetings. Although the record indicates that most of the opposition was targeted against using site 1M, there is nothing in the record to indicate opposition to ocean dumping in general on the outer continental shelf, where both sites 1M and B1 are located. Additionally, the specific comments about site 1M also apply to site B1 since the fisheries at both sites are essentially the same. Therefore, we conclude that the notice and opportunity for comment provided by the Army Corps of Engineers satisfies NEPA's requirement of meaningful public participation during the decision making process. Consequently, this compliance diminishes the plaintiffs' likelihood of success on the merits of their NEPA claim.

### 2. *Substantive Challenges.*

To evaluate the adequacy of an EIS, a district court "must make a pragmatic judgment whether the EIS's form, content and preparation foster both informed decisionmaking and informal public participation." *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974). Although the reviewing court will not flyspeck an EIS, "an EIS may be found inadequate under NEPA if it does not reasonably [set] forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision." *Oregon Environmental Council v. Kunzman,* 817 F.2d at 493 (quotation omitted).

■ The final supplement to the FEIS designated site B1 as the disposal site for the initial 500,000 cubic yards of dredged material removed from Oakland's Inner Harbor. The Army Corps of Engineers decided to use site B1 after receiving numerous comments from the public and California State agencies opposing use of site 1M and suggesting use of site B1 as an alternative.

Additionally, a Technical Review Panel ("Panel") also considered the technical issues surrounding the selection of an ocean disposal site. The Panel was comprised of scientific experts from both the Environmental Protection Agency and the Army Corps of Engineers. The Panel observed that with regard to the ocean disposal sites, there was "an absence of site specific quantitative data on the physical, chemical and biological oceanography, as well as uncertainties resulting from annual fluctuations in fishery catches." As a result, the Panel concluded that they could not find compelling environmental reasons to choose between site 1M or site B1 for ocean disposal. However, because the available information suggested a greater potential for conflict with fishery interests at site 1M than at site B1 and a probable lower erosion potential at site B1, the Panel concluded

that the ocean disposal site should be located at site B1B, located in the vicinity of site B1, on the edge of the fishery between sites B1 and B1A. The Panel also noted that a monitoring program would be required, describing pre-disposal (baseline) conditions, water column plume behavior during disposal, and post-disposal conditions.

The panel specifically found that only the material from Harbor reaches 1 and 2, and station 3aa of the Inner Harbor, totaling approximately 400,000 cubic yards, was suitable for ocean disposal. The material to be dredged from stations 3cc and 3dd of the Inner Harbor was determined to be contaminated and therefore unsuitable for ocean disposal because of the presence of significant concentrations of heavy metals and organic pollutants. The panel also found that the data presented to them was insufficient with regard to the Outer Harbor, and that the material to be dredged from the Outer Harbor required further physical, chemical and biological evaluation before determining its suitability for ocean disposal.

The Army Corps of Engineers incorporated the comments supplied by the Technical Review Panel, the public and others into the final supplement to the FEIS. The final supplement addressed the site specific problems surrounding use of site B1 for ocean disposal relative to the hardship to the plaintiffs and to the fishery in the vicinity of site B1. Although the plaintiffs claimed that they would not be able to fish at B1, they failed to show that they would not be able to fish elsewhere. Additionally, the parties presented conflicting evidence regarding the fish resources, and the fish and crab destruction, displacement, and repopulation at site B1. Based on this information from both parties, the agency exercised its judgment and approved use of a site in the vicinity of B1 for ocean disposal. We will not disturb the Army Corps of Engineer's judgment and substitute our own concerning the wisdom or prudence of a proposed action. *California v. Block,* 690 F.2d at 761. With regard to the site specific problems relative to the plaintiffs and the fishery resulting from use of a site in the vicinity of B1, the final supplement contains a sufficiently thorough discussion of the probable environmental consequences to satisfy NEPA's requirement of informed decision making and informed public participation. See *Warm Springs Task Force v. Gribble,* 565 F.2d 549, 552 (9th Cir.1977) (per curiam).

Although the Corps evaluated the site specific problems associated with use of a site in the vicinity of B1 on the fishery and the fishermen, other aspects of the final supplement violate NEPA's requirement of ensuring that the decision maker has the information necessary to consider the environmental factors and make a reasoned decision. The final supplement fails to provide any site specific quantitative data regarding the physical, chemical or biological oceanography of the area surrounding site B1. These omissions are particularly disturbing since the final supplement proposed dumping the heavily contaminated dredgings into the ocean and then "capping" them with uncontaminated material to secure them. This proposal lacks any rational basis, is without site specific data regarding the effect of the area's oceanography on the potential spread of these dumped contaminants, and, as reported by the Technical Review Panel, could be lethal to certain marine life.

Additionally, the final supplement fails to set forth any baseline conditions or a monitoring program for ocean disposal at a site in the vicinity of B1. "NEPA clearly requires that consideration of environmental impacts of proposed projects take place *before*" [a final decision] is made." *LaFlamme v. FERC,* 842 F.2d 1063, 1071 (9th Cir.1988) (emphasis in original). Once a project begins, the "pre-project environment" becomes a thing of the past, thereby making evaluation of the project's effect on pre-project resources impossible. *Id.* Without establishing the baseline conditions which exist in the vicinity of B1 before ocean dumping begins, there is simply no way to determine what effect the proposed dumping near B1 will have on the environment and, consequently, no way to comply with NEPA.

If the decision making process would have stopped with the defendants' preparation of the final supplement, the substantial omissions in that document would require us to conclude that the defendants had violated NEPA's requirement of ensuring that the decision maker has the information necessary to consider environmental factors and make a reasoned decision. Consequently, the plaintiffs likelihood of success on their NEPA claim would have increased and might have tipped the scale sufficiently to permit granting an injunction.

However, the decision making process did not stop with the final supplement. Fortunately for the defendants, the Environmental Protection Agency (EPA) saved the day.

Under the MPRSA, the Secretary of the Army "may issue permits, after notice and opportunity for public hearings, for the transportation of dredged material for the purpose of dumping it into ocean waters, where the Secretary determines that the dumping will not unreasonably degrade or endanger human health, welfare or amenities, or the marine environment, ecological systems, or economic potentialities." 33 U.S.C. § 1413(a) (1986). However, the Act further provides that "[p]rior to issuing any permit under this section, the Secretary shall first notify the Administrator [of the Environmental Protection Agency] of his intention to do so. In any case in which the Administrator disagrees with the determination of the Secretary as to compliance with the criteria established pursuant to § 1412(a) of this title relating to the effects of the dumping or with the restrictions established pursuant to § 1412(c) of this title relating to critical areas, the determination of the Administrator shall prevail. Unless the Administrator grants a waiver pursuant to subsection (d) of this section, the Secretary shall not issue a permit which does not comply with such criteria and with such restrictions." 33 U.S.C. § 1413(c) (1986). See also 40 C.F.R. §§ 220.4 and 225.2 (1987).

The EPA report concurred with the Corps' selection of site B1B for the ocean disposal site. The EPA's concurrence was limited to ocean disposal of only approximately 500,000 cubic yards of dredged material and was expressly conditioned on incorporating into the permit the following restrictions: (1) only material from the Inner Harbor found suitable for ocean disposal, i.e. uncontaminated material, can be disposed of at site B1B; (2) the Corps must monitor the disposal site to evaluate impacts on the marine environment.

In issuing their concurrence, the EPA considered the information provided by the plaintiffs, the final supplement, the Technical Review Panel's findings and report, and the results of public meetings with federal, state and local interest groups. Based on this information, the EPA concluded that site B1B was acceptable "because the location and size are designed to minimize impacts to existing fisheries, water quality, the Gulf of Farallones National Marine Sanctuary, and possible Minerals Management Service lease-sale blocks." Additionally, the EPA considered site B1B to be a feasible choice because the amount of material proposed for disposal is small (500,000 cubic yards) relative to the entire Oakland project (7 million cubic yards), and because designating a site off the continental shelf would double the cost of the disposal operation. This type of evaluation and coordination of information from both government agencies and the general public during the decision making process is precisely what NEPA's goal of reasoned and informed decision making is all about.

The EPA report states that since circulating the final supplement, the Corps has developed a proposed monitoring program for the B1B site dated April 1988. The purpose of this monitoring program is to compare the impact of disposal on the marine environment to a set of baseline conditions. The EPA does not indicate whether these baseline conditions have been established. Rather, they state that "the baseline conditions should include physical, geological and biological parameters." In the Corps' Record of Decision, issued one day after the EPA's report, the Corps states that "baseline survey of the B1B disposal site has been conducted and the site will be

monitored during and after disposal." With this information available, the disposal at site B1B can be monitored, and the Corps satisfies NEPA's requirement that environmental impacts of a proposed action be considered before a final decision has been made.

Although the record does not include the actual baseline conditions developed by the Corps, neither the plaintiffs or the record before us suggest any reasons to question the Corps' statement that baseline conditions have been established.

With regard to disposing of the contaminated dredged material, the EPA concluded that the final supplement's proposal to "cap" the contaminated material with uncontaminated material was premature, because it was not based on any site specific oceanographic studies. Instead, the Corps' Record of Decision requires that the estimated 100,000 cubic yards of contaminated material be deposited in an approved upland site. This estimate of 100,000 cubic yards may change because the EPA indicated that the dredgings must be tested as they are removed. This testing procedure complies with NEPA by ensuring adequate consideration of the environmental impact of disposal before a final decision is made designating use of the ocean or the upland site for disposal.

Finally, the EPA emphasized that the Corps must prepare a supplemental EIS ("SEIS") for the remaining 6.5 million cubic yards authorized to be dredged from the Oakland Harbor. The EPA stated that "[t]his evaluation should include a complete analysis of relevant California Department of Fish & Game fisheries data, as well as any other detailed physical, chemical, geological and biological oceanographic information related to site characterization. Prior consultation on the designation process with federal, state and local resource agencies, fishermen, local environmental organizations and the general public is critical." Furthermore, the EPA will "require that additional alternatives, such as a site off the continental shelf and/or the historical chemical munitions disposal site west of the Gulf of Farallones National Marine Sanctuary, be considered in the SEIS." Beyond these alternatives, the EPA directed the Corps to follow Section 102 of the MPRSA's site designation criteria "for resolution of the remaining 6.5 million cubic yards disposal and all subsequent actions."

### 3. *Summary*

The Corps' Record of Decision ("ROD") represents their final decision with regard to selecting a disposal site for the approximately 500,000 cubic yards to be dredged from Oakland's Inner Harbor. We conclude that by incorporating the EPA's suggestions into their final decision, the Corps' final decision complies with NEPA's requirements. The draft supplement provided the plaintiffs with both notice and an opportunity to comment on the proposed alternatives to dumping at Alcatraz, namely, dumping in the ocean in areas located on the outer continental shelf where there were known fisheries. The final supplement evaluated and addressed the site specific impacts of ocean dumping at a sight in the vicinity of B1 on the fisheries and on the fishermen. The EPA's report and the ROD indicate that baseline conditions have been identified, and a monitoring program has been established. The ROD also indicates that only 500,000 cubic yards, roughly 7% of the total 7 million cubic yards to be dredged, is at issue at this stage in the proceedings. Of these 500,000 cubic yards, any material found to be contaminated will be sent to an approved upland disposal site, and will not be disposed of in the ocean. Thus, only an estimated 400,000 cubic yards, or roughly 5%, of the 7 million cubic yards to be dredged will be dumped without an amended SEIS. All of these factors compel the conclusion that although it was at the urging of the EPA, in the final analysis the Corps took the requisite "hard look" at the environmental impact of their proposed action, and therefore complied with NEPA.

### B. *Balance of Hardships*

■ At the present time, American President Lines, Ltd. ("APL") calls at the Port of Oakland Inner Harbor with two separate

deployments of vessels. One deployment consists of larger containerships, while the other deployment consists of some larger and some smaller containerships. A total of two vessels, one from each deployment, calls at the Port of Oakland each week.

APL has implemented a new vessel construction program, which includes the delivery of five new super containerships. The first of these super containerships is scheduled to arrive at the Port of Oakland on June 10, 1988.

The defendants argue that enjoining the removal of the first 500,000 cubic yards of material from Oakland's Inner Harbor will create a severe hardship for the defendant Port of Oakland (Oakland). Removing 500,000 cubic yards of material will increase the depth of the Inner Harbor from 35 feet to 38 feet, and thereby enable the Inner Harbor to accommodate the first super containership due in June. After the initial visits the super containerships will carry heavier loads and the Inner Harbor's depth must be lowered to 42 feet if the Port is to accommodate the more heavily laden super containerships.

The defendants claim that if the 500,000 cubic yards of material is not removed from the Inner Harbor, Oakland will not be able to accommodate the first super containership arrival on June 10, 1988. The extent of the hardship to Oakland resulting from not being able to accommodate this super containership is somewhat speculative. The declaration of Lorenz P. Robinson, Senior Vice President of Operations for American President Lines ("APL"), indicates that APL has not made a final decision on which west coast port will be the first port of call for APL's new super containerships. He further states that if APL were to choose the Port of Oakland as the first port of call it would be an essential precondition that the Oakland Inner Harbor turning basin be enlarged and the channel dredged by June 10, 1988 or immediately thereafter to at least 38 feet below MLLW. Moreover, he indicates that by the end of 1989 or early 1990 the channel and harbor and must be dredged to 42 feet below MLLW. He states that in the event

the turning basin is not enlarged and the basin and channel are not dredged to 38 feet by June 10, APL may decide to phase out entirely one of its two vessel deployments to Oakland, and if Oakland cannot provide the channel and turning basin facilities to handle the super containerships as they come on line, APL may discharge all cargo at a southern California port. In that eventuality it may not be feasible later on for APL to reinstate service to Oakland even if the harbor is improved at a later date. Clearly, the failure to remove the initial 500,000 cubic yards of material from the Inner Harbor will deprive the Port of Oakland of the opportunity to take advantage of accommodating the first APL super containership, and possible future APL shipping business.

The defendants argue that unless they can dump the dredged material at site B1B and thereby allow the Inner Harbor and turning Basin improvement to be completed, Oakland will lose more than $50 million it invested in its first port of call plan. The setback would also have an impact on the investments of $130 million still planned.

We must evaluate Oakland's alleged hardship in light of the fact that APL as of May 5, 1988 had not yet made a final decision on which West Coast port will be the first port of call for its new generation of super containerships. As a result, Oakland can only speculate about the economic losses they might endure if they are precluded from improving their harbor by June 10, 1988. We conclude that defendants' failure to lower the Inner Harbor channel depth and turning basin from 35 feet to 38 feet below MLLW and to expand the turning basin by June 10, 1988 could cause APL to decide not to make the Port of Oakland its west coast first port of call and to phase out entirely its vessel deployments to the Port of Oakland as the new super containerships come into service. The magnitude of the hardship to Oakland that would result from APL eliminating the Port of Oakland from further consideration when selecting its west coast first port of call would be great. Coupled with Oakland's certain loss of APL's smaller containerships as they are replaced with APL's

**514**

new super containerships, the hardships on Oakland resulting from failing to deepen the harbor are substantial. As discussed above, the plaintiffs' hardships result from their alleged loss of fishing opportunities at site B1B. However, on the record before us, the plaintiffs have failed to show that they would not be able to fish elsewhere, possibly nearby, or that the fish and crab would not be able to relocate or repopulate, or the extent that the fish or crab would be destroyed, if at all. Therefore, on the record before us, we conclude that the defendants' hardships outweigh the plaintiffs' hardships.

### III. *Conclusion*

This court will reverse a district court's denial of a preliminary injunction only if the district court's denial amounts to an abuse of discretion. Based on the evidence presented by the parties and the record before us, we cannot conclude that the district court abused its discretion when it denied the plaintiffs' motion for a preliminary injunction. The Corps' final decision reflects compliance with NEPA, MPRSA, and the applicable regulations. The balance of hardship tips in the defendants' favor due to the economic losses which would result from failure to deepen and improve the Port of Oakland as scheduled, and plaintiffs' failure to present evidence of any certain economic losses or destruction or damage to the fish or crab. Accordingly, we affirm the district court's denial of the plaintiff's motion for a preliminary injunction.

AFFIRMED.