**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; TURTLE ISLAND RESTORATION NETWORK; JAPAN ENVIRONMENTAL LAWYERS FEDERATION; SAVE THE DUGONG FOUNDATION; ANNA SHIMABUKURO; TAKUMA HIGASHIONNA; YOSHIKAZU MAKISHI, *Plaintiffs-Appellants*, <br><br> v. <br><br> MARK ESPER, Secretary of Defense;* UNITED STATES DEPARTMENT OF DEFENSE, <br> *Defendants-Appellees.* | No. 18-16836 <br><br> D.C. No. 3:03-cv-04350-EMC <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted February 3, 2020
San Francisco, California

Filed May 6, 2020

---

* Mark Esper is substituted for his predecessor, Patrick Shanahan, as Secretary, Department of Defense, under FRAP 43(c)(2).

Before:  Richard A. Paez and Carlos T. Bea, Circuit Judges,
and Janis Graham Jack,** District Judge.

Opinion by Judge Jack;
Concurrence by Judge Bea

## SUMMARY***

### National Historic Preservation Act / Environmental Law

The panel affirmed the district court's grant of summary judgment for the U.S. Department of Defense in an action raising challenges to the Department's construction and operation of a replacement aircraft base for the U.S. Marine Corp Air Station Futenma in Okinawa, Japan, and its potential adverse effects on the Okinawa dugong, an endangered marine mammal that is culturally significant.

The panel held that the Department, as part of a plan to construct a new base in Okinawa, Japan, complied with the procedural requirement that it "take into account" the effects of its proposed action on foreign property under Section 402 of the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 307101(e).  As a matter of first impression, the panel outlined what is required by Section 402's "take into account" directive.  The panel agreed with the district court

---

** The Honorable Janis Graham Jack, United States District Judge for the Southern District of Texas, sitting by designation.

*** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

that the process must include (1) identification of protected property, (2) generation, collection, consideration, and weighing of information pertaining to how the undertaking will affect the protected property, (3) a determination as to whether there will be adverse effects or no adverse effects on the protected property, and (4) if necessary, development and evaluation of alternatives or modifications to the undertaking that could avoid or mitigate the adverse effects on the protected property. The panel further held that consultation with the host nation, outside experts, or private parties will be necessary for an agency to meet its obligations.

The panel rejected appellants' challenges to this consultation requirement, and held that Section 402 compliance does not require an agency to consult with specific parties, or to permit direct public participation. Specifically, the panel held that the regulations implementing NHPA Section 106's "take into account" process did not apply to NHPA Section 402. The panel construed Section 402 as requiring reasonable consultation with outside entities to determine how an undertaking may impact a protected property and what may be done to avoid or mitigate any adverse effect. The panel held that Section 402 delegates to federal agencies the specific decisions of which organizations, individuals, and/or entities to consult (or not consult) and the manner in which such consultation occurs. The panel declined to construe Section 402 as requiring public participation. The panel applied the requirements for complying with Section 402, and held that the Department's process for complying with Section 402 was reasonable, and that the Department was not required to engage in the additional process appellants sought.

The panel held that the Department's finding that its proposed action would have no adverse effect on the dugong was not arbitrary or capricious under Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706. Specifically, the panel held that substantial evidence supported the Department's conclusion that the presence of the dugong in the area on the new base was sporadic, even if it did not possess more robust baseline population data; and the Department reasonably concluded that there would be no adverse effects on the dugong as a result of the new base. The panel further held that the Department was not unreasonable when it failed to consider population fragmentation, disruption of travel routes, and loss of habitat required to sustain the population, in evaluating the impacts of the new base on the dugong. The panel also held that the Department rationally concluded that the construction and operation of the new base would not adversely impact the dugong population, and would have no adverse effect on the dugong's cultural significance.

Judge Bea concurred, and joined the majority opinion in full, apart from footnote 2. Judge Bea wrote separately because he believed that a better resolution of the case would be to affirm the district court judgment on the ground that Section 402 does not apply to the dugong as a matter of law.

## COUNSEL

Danny G. Thiemann (argued), Sarah H. Burt, and J. Martin Wagner, Earthjustice, San Francisco, California; for Plaintiffs-Appellants.

John L. Smeltzer (argued), Mark R. Haag, Peter Kryn Dykema, Taylor N. Ferrell, and Ragu-Jara "Juge" Gregg, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Robert Smith and Cara M. Johnson, Office of General Counsel, Department of the Navy, Washington, D.C.; for Defendants-Appellees.

## OPINION

JACK, District Judge:

In this environmental action, we are asked to consider two questions: (1) whether the Department of Defense, as part of a plan to construct a new base in Okinawa, Japan, complied with the procedural requirement that it "take into account" the effects of its proposed action on foreign property under Section 402 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 307101(e); and (2) whether the Department's finding that its proposed action would have no adverse effect on the foreign property was arbitrary, capricious, an abuse of discretion, and/or contrary to law in violation of Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706. We hold that the Department met its procedural obligations and that its finding of "no adverse impact" was not arbitrary and capricious and therefore affirm the district court's grant of the Department of Defense's motion for summary judgment.

## I.   Relevant Factual & Procedural Background

In a 2017 opinion, we detailed the background and lengthy procedural history of this case. *See Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017).

In light of that discussion, we do not repeat it here. To give context to our opinion, however, we briefly recap the nature of the dispute and one of the district court's critical rulings leading up to this appeal.

This action arises out of the Department's construction and operation of the Futenma Replacement Facility in Okinawa, Japan, a replacement aircraft base for the U.S. Marine Corp Air Station Futenma, hereinafter referred to as the "new base," and its potential adverse effects on the Okinawa dugong, an endangered marine mammal that is culturally significant to many Okinawans.

In 2003, Appellants, who are private individuals and environmental organizations interested in the preservation of the Okinawa dugong population, filed the instant action under the APA alleging the Department failed to take into account the adverse effects of the new base on the Okinawa dugong in violation of Section 402[1] of the NHPA. The Department moved to dismiss the action on the grounds that the Japanese Law for the Protection of Cultural Properties, under which the Okinawa dugong is protected as a natural monument, was not "equivalent" to the U.S. National Register of Historic Places for purposes of applying Section 402, and that the Okinawa dugong did not qualify as "property" subject to the requirements of Section 402.

In 2005, the district court denied the Department's motion, holding that the Japanese Law for the Protection of Cultural Properties was the "equivalent of the National Register" and that the Okinawa dugong qualified as "property." *Dugong v. Rumsfeld*, No. C 03-4350, 2005 WL

---

[1] All references to Section 402 shall be to Section 402 of the NHPA.

522106, at *6–12 (N.D. Cal. Mar. 2, 2005) (*Okinawa Dugong I*).

Regarding its property holding, the district court noted that it could end its inquiry over whether the Okinawa dugong qualified as "property" upon finding that the Japanese Law for the Protection of Cultural Properties was equivalent to the National Register. *Id*. at *8. Instead, however, it addressed the Department's main argument and analyzed whether the Okinawa dugong was "property" under the NHPA's statutory framework. *Id*. at *8–12. The court explained that the Okinawa dugong fulfilled each element of the definition of an "object" under 36 C.F.R. § 60.3(j), which is sufficient to qualify as "property" under the NHPA. *Id*. at *9; *see* 36 C.F.R. § 800.16l(1) (defining "historic property" as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places"); 36 C.F.R. § 60.3(j) (defining "object" as "a material thing of functional, aesthetic, cultural, historical or scientific value that may be, by nature or design, movable yet related to a specific setting or environment"). The court found that the Okinawa dugong satisfied the definition of an "object" because it was a "material thing" that was "movable, yet related to a specific setting or environment." *Id*. at *10–12.

Following the denial of the Department's motion, the parties conducted discovery regarding the adequacy of the Department's take into account process on the adverse effects of the new base on the Okinawa dugong, and then filed cross-motions for summary judgment.

In 2008, the district court granted Appellants' cross-motion, finding that the Department failed to take into account adequately the adverse effects of the new base on the Okinawa dugong. Crucial to the instant appeal, it held

that a "take into account" process under Section 402 consisted of four basic components:

> (1) identification of protected property, (2) generation, collection, consideration, and weighing of information pertaining to how the undertaking will affect the historic property, (3) a determination as to whether there will be adverse effects or no adverse effects, and (4) if necessary, development and evaluation of alternatives or modifications to the undertaking that could avoid or mitigate the adverse effects.

*Okinawa Dugong v. Gates*, 543 F. Supp. 2d 1082, 1104 (N.D. Cal. 2008) (*Okinawa Dugong II*).  The district court also stated that "a federal agency does not complete the take into account process on its own, in isolation, but engages the host nation and other relevant private organizations and individuals in a cooperative partnership." *Id.*  The district court concluded that the Department failed to comply with the requirements of Section 402 in connection with its plan to construct the new base.  *Id*. at 1111.  It found that there was "no evidence that a single official from [the Department] with responsibility for the [new base] ha[d] considered or assessed the available information on the dugong or the effects of the [new base]."  *Id*. at 1108.  Accordingly, it ordered the Department to comply with the requirements of Section 402 and held the case in abeyance until such time as the Department completed its "take into account" process on the effects of the new base on the dugong.  *Id*. at 1112.

In the years following the district court's order, the Department conducted a "take into account" process regarding the potential adverse effects of the new base on the dugong.  In doing so, the Department relied on five sources:

(1) *The Welch Report:* an anthropological report by Dr. David A. Welch commissioned by the Department regarding the cultural significance of the Okinawa dugong in Okinawan culture;

(2) *The Jefferson Report:* a biological assessment of the Okinawa dugong by Dr. Thomas A. Jefferson commissioned by the Department;

(3) *The Futenma Replacement Facility Bilateral Experts Study Group Report*: an August 31, 2010 report by a bilateral group of U.S. and Japanese representatives studying the new base's location, configuration, and construction method;

(4) *The SuMMO Project Final Report*: an August 28, 2013 report of the Survey of the Marine Mammals of Okinawa (SuMMO) Project conducted in 2011–2012, on behalf of the United States Marine Corps, to update the Integrated Natural Resources/Cultural Resources Management Plan for the Marine Corps Base Camp Smedley D. Butler;

(5) *The Japanese Government's Environmental Impact Statement/Assessment (EIS/EIA)*: Translated excerpts of the Japanese government's final and draft environmental impact statement/assessment on the effects of the new base on the dugong.

Based on its investigation, the Department concluded that there would be "'no adverse effect' on the Okinawa dugong"

as a result of the new base "because of the extremely low probability of Okinawa dugong being in" the area of the new base.  U.S. Marine Corps Recommended Findings (April 2014) ("2014 USMC Findings"), § 3.1.  It also concluded that "should dugongs in fact be present, the construction and operational activity [would] primarily [be] of the type that would not have an adverse effect" on them.  *Id.*

In 2014, the Department filed a notice of completion of its "take into account" process, attaching its findings.  In response to the Department's notice, Appellants filed a first supplemental complaint, alleging that the Department violated the requirements for a "take into account" process under Section 402 by failing to (1) consult Appellants as interested parties in the "take into account" process, (2) provide information to the public about the proposed new base and its potential effects on the Okinawa dugong, and (3) seek public comment and input.  First Suppl. Compl., ¶¶ 48–50.  They also alleged that the Department's finding that the new base would have no adverse effects on the dugong was arbitrary and capricious and violated Section 706 of the APA.  *Id.*, ¶ 51.

The district court initially dismissed the supplemental complaint on the grounds of political question and standing.  *Ctr. for Biological Diversity v. Hagel*, 80 F. Supp. 3d 991, 1019 (N.D. Cal. 2015) (*Okinawa Dugong III*).  We reversed and remanded to the district court for consideration of Appellants' claims on the merits.  *Ctr. for Biological Diversity*, 868 F.3d at 830.

On remand, the parties filed cross-motions for summary judgment on the adequacy of the Department's "take into account" process.  The district court granted the Department's motion for summary judgment, finding that Appellants had not demonstrated that the Department's

"take into account" process was unreasonable or violated Section 402, and the Department's finding that the new base would have no adverse effects on the dugong was not arbitrary or capricious. *Okinawa Dugong v. Mattis*, 330 F. Supp. 3d 1167, 1197–98 (N.D. Cal. 2018) (*Okinawa Dugong IV*).

Appellants timely appealed.

## II.  Standard of Review

Because the NHPA is a procedural statute that provides no independent basis for judicial review, a plaintiff who brings a cause of action under the NHPA must do so under the APA.  *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005).  The APA authorizes judicial review of final agency actions or decisions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *Ctr. for Biological Diversity*, 868 F.3d at 816 n.5.  We therefore construe the instant action as being brought under the APA.  *Ctr. for Biological Diversity*, 868 F.3d at 816 n.5.

We review de novo a challenge to a final agency action decided on summary judgment and pursuant to Section 706 of the APA. *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 732 (9th Cir. 2017).

### III.   Analysis[2]

### A. The Department's Section 402 Compliance

#### 1. Requirements for Section 402's "Take Into Account" Process

As a matter of first impression, we must decide what is required by Section 402's directive that an agency must "take into account the effect of the undertaking on the property for purposes of avoiding or mitigating any adverse effect." 54 U.S.C. § 307101(e). To begin, we agree with the district court that the process must include (1) identification of protected property, (2) generation, collection, consideration, and weighing of information pertaining to how the undertaking will affect the protected property, (3) a determination as to whether there will be adverse effects or

---

[2] We do not consider the Department's challenge to the district court's 2005 ruling that Section 402 applies to the dugong. *See Okinawa Dugong I*, 2005 WL 522106, at \*6–12. While "a notice of cross-appeal is a rule of practice [] . . . rather than a jurisdictional requirement," *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1298 (9th Cir. 1999), the Department should have filed a notice of cross-appeal on this issue given the unique circumstances of this litigation. The issue of whether Section 402 applies to the dugong was litigated 13 years ago, during which time the district court decided summary judgment twice. *See Okinawa Dugong II*, 543 F. Supp. 2d 1082; *Okinawa Dugong IV*, 330 F. Supp. 3d 1167. Both rulings relied, in part, on the earlier ruling that Section 402 applied to the dugong. To consider the Department's challenge now would effectively undermine 13 years of litigation, not to mention the parties' and the courts' time and resources. Furthermore, although the Department initially filed a notice of cross-appeal on this issue in 2015, it later withdrew the notice. Since that time, the Department has given no indication that it intended to appeal this issue until its Answering Brief in this appeal, which was filed 14 years after the ruling in question. On top of this, the Department's failure to file a cross-appeal is entirely unexplained.

no adverse effects on the protected property, and (4) if necessary, development and evaluation of alternatives or modifications to the undertaking that could avoid or mitigate the adverse effects on the protected property. These are straightforward requirements that will allow agencies to evaluate how their undertakings impact foreign protected properties and enable agencies to take reasonable mitigation measures. We also agree with the district court that "a federal agency does not complete the take into account process on its own, in isolation," *Okinawa Dugong II*, 543 F. Supp. 2d at 1104, and that consultation with the host nation, outside experts, or private parties will be necessary for an agency to meet its obligations.[3] It is the required scope of this consultation that the parties contest today.

Appellants argue that the Department's "take into account" process violated the requirements of Section 402 because the Department failed to consult with Appellants and local community members, provide an opportunity for public participation, and consult with any entity regarding the effect of the new base on the cultural characteristics of the dugong. Appellants make their argument by citing to regulations governing a separate provision of NHPA, Section 106. We disagree with Appellants' arguments and hold that Section 402 compliance does not require an agency

---

[3] Outside consultation is not a standalone requirement for Section 402 compliance. Rather consultation with the host nation, outside experts, private parties, or others enables the agency to collect and analyze data about whether and how the undertaking will impact protected properties, and if so, develop avoidance or mitigation measures. As discussed below, a decision to consult, or not, in any specific instance or in any specific manner or with any specific person is evaluated to ensure the agency's process was reasonable.

to consult with specific parties, or to permit direct public participation.

### a.  Applicability      of      Regulations Governing Section 106

We initially decide whether the regulations governing a Section 106[4] "take into account" process apply to Section 402 such that a federal agency *must* consult with specific organizations, individuals, and/or entities, and provide a period of public notice and comment, to comply with Section 402 the same as it must to comply with Section 106. We conclude that regulations implementing Section 106 do not apply to Section 402.

Unlike Section 106, there are no regulations governing Section 402, and neither is there an agency empowered to promulgate binding regulations for implementing Section 402. The full scope of Section 402's requirements are found in the statutory text that requires agencies performing an "undertaking outside the United States that may directly and adversely affect a property that is on the World Heritage List or on the applicable country's equivalent of the National Register," to "take into account the effect of the undertaking

---

[4] NHPA Section 106 requires federal agencies to "take into account the effect of the undertaking on any historic property" and to "afford the [Advisory] Council [on Historic Preservation] a reasonable opportunity to comment with regard to the undertaking." 54 U.S.C. § 306108. Unlike Section 402, which applies abroad, Section 106 applies to "undertakings" that occur within the United States. The Advisory Council on Historic Preservation is authorized by statute to issue binding regulations regarding Section 106 implementation, and current regulations require agencies to consult with certain organizations, entities and/or individuals, and to seek public comment on proposed undertakings effecting historic properties, before proceeding with the project. *See* 54 U.S.C. § 304108(a); 36 C.F.R. § 800.2.

on the property for purposes of avoiding or mitigating any adverse effect."    54 U.S.C. § 307101(e). Nevertheless, Appellants argue that regulations governing Section 106, if not directly, then implicitly, apply to Section 402 and require a federal agency to adhere to those regulations in a Section 402 "take into account" process. *See, e.g.*, 36 C.F.R. §§ 800.2 *et seq.* (regulations outlining requirements for a Section 106's "take into account" process which include, *inter alia*, consultation with parties, individuals, and/or entities specified under the regulation and public participation).

We look to NHPA's statutory framework to determine whether it is correct to apply regulations governing Section 106's "take into account" process to Section 402. The fact that Section 402 is identical in material aspects to its domestic counterpart, Section 106, initially suggests that it might be correct to apply Section 106's regulations to Section 402 because the phrase "take into account" is used in both sections in the same manner.[5]  *Compare* 54 U.S.C. § 306108 (under Section 106, a federal agency must "take into account the effect of the undertaking on any historic property" within the United States), *with* 54 U.S.C. § 307101(e) (requiring a federal agency to "take into account the effect of the undertaking on the property" outside of the United States under Section 402). Counseling against this

---

[5] The Advisory Council on Historic Preservation (ACHP) regulations implementing Section 106's "take into account" process requirements were also in existence by the time Congress enacted Section 402 in 1980. *See Hall v. U.S. E.P.A.*, 273 F.3d 1146, 1158 (9th Cir. 2001) ("When Congress incorporates the text of past interpretations, 'Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing . . . interpretations.'" (quoting *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)).

application, however, is the absence of an express delegation of authority by Congress to a federal agency to promulgate implementing regulations for Section 402. We construe this absence as evidence of Congress's intent to give a federal agency flexibility in conducting a "take into account" process under Section 402. *See Envtl. Def. v. Duke Energy Corp*., 549 U.S. 561, 574 (2007) ("A given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.").

We therefore conclude that Section 106's regulations do not apply to Section 402 under the NHPA's statutory framework. However, this does not end our inquiry. Even though Section 106's regulations do not apply to Section 402, we must still consider whether Section 402 should nevertheless be construed as requiring the specific consultation and public participation Appellants seek.

### b.  Consultation Requirement

Requiring a federal agency to engage in reasonable consultation with other nations, local governments, private organizations, individuals, or others as part of the process for taking into account the effects its projects may have on foreign protected property is consistent with Section 402's purpose and congressional intent. When Congress enacted Section 402, it declared that it was "the policy of the Federal Government . . . to provide leadership in the preservation of the historic property of the United States and of the international community of nations" "*in cooperation with other nations and in partnership with the States, local governments, Indian tribes  . . . and private organizations and individuals*." 54 U.S.C. § 300101(2) (emphasis added). Additionally, the Department of Interior's (DOI) Guidelines provide, in relevant part, that "[e]fforts to identify and

consider effects on historic properties in other countries should be carried out in consultation with the host country's historic preservation authorities, with affected communities and groups, and with relevant professional organizations." 63 Fed. Reg. 20,496, 20,504 (Apr. 24, 1998).[6] However, the absence of regulations governing which specific parties, individuals, and/or entities to consult demonstrates that those decisions should be left to the discretion of the agency. *See id.* at 20,504 (stating that "specific consultation requirements and procedures will vary among agencies depending on their missions and programs, the nature of historic properties that might be affected, and other factors").[7]

Accordingly, we construe Section 402 as requiring reasonable consultation with outside entities to determine how an undertaking may impact a protected property and

---

[6] Although the DOI is charged with "direct[ing] and coordinat[ing] participation by the United States in the World Heritage Convention," 54 U.S.C. § 307101(b), its guidelines "have no regulatory effect." 63 Fed. Reg. at 20,496.

[7] Although the DOI Guidelines also state that "consultation should always include all affected parties," 63 Fed. Reg. at 20,504, we need only accord these Guidelines *Skidmore* deference to the extent that they have the "power to persuade." *Sierra Club v. Trump*, 929 F.3d 670, 693 (9th Cir. 2019) (under *Skidmore* deference, "we look to 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))). The Guidelines are persuasive only to the extent that they encourage consultation with all interested parties and organizations, *to the extent possible*, during a Section 402 "take into account" process. *See, e.g.*, *Marshall v. Anaconda Co.*, 596 F.2d 370, 375 (9th Cir. 1979) (explaining that "the intent to make mandatory is unmistakable when 'shall . . . unless' language is used[;] "[s]hould . . . unless" language is clearly [m]ore advisory").

what may be done to avoid or mitigate any adverse effect. But, because the nature of reasonable consultation will naturally vary based on the agency involved and the scope of the undertaking, we also find Section 402 delegates to federal agencies the specific decisions of which organizations, individuals, and/or entities to consult (or not consult) and the manner in which such consultation occurs. *See, e.g.*, *Okinawa Dugong II*, 543 F. Supp. 2d at 1105 (explaining that while "Congress may have been silent on the regulatory specifics and implementation details, *allowing the precise letter of the statute to be filled in by a particular agency depending on the agency's mission and undertaking*, Congress was clear on the basic spirit and framework of the take into account process" (emphasis added)).  An agency's decision about the scope of outside consultation for any given undertaking will be upheld unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### c.  Public Participation Requirement

We decline to construe Section 402 as requiring public participation because there is no evidence of congressional intent to require public participation, and there are no guidelines interpreting Section 402 to include public participation.  Public participation, such as through a period of notice and comment, is simply one means by which an agency may fulfill part of its procedural obligations under Section 402, and an agency's choice not to engage the public directly will be upheld unless the decision was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

### 2. The Department's Section 402 Compliance Procedures

We now apply the requirements for complying with Section 402 to the Department's actions.  Because this action proceeds under the APA, we review the Department's decisions for reasonableness.  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016).  To determine whether an agency's decision was reasonable, we look to whether the agency's decision was "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation and internal quotation marks omitted).

The Department clearly complied with the first requirement that it identify the protected property at issue. The district court's 2005 order made it explicit that the Okinawa dugong was property protected by Section 402. To comply with the second requirement that it generate, collect, consider, and weigh information pertaining to how the new base may affect the dugong, the Department commissioned multiple studies, reviewed others that had previously been completed, and issued a final report of its findings. Studies conducted by the Department analyzed both potential biological and cultural impacts from constructing the new base. The anthropological study, headed by Dr. Welch, included indirect consultation with Okinawans who engage in cultural practices with the dugong. The Department also directly engaged with the Japanese government as part of a bilateral working group and incorporated the Japanese government's environmental impact study into its final recommendation.  For the third requirement, based on the information the Department collected about the impact the

new base would have on the dugong, it determined there would be no adverse effects on the dugong,[8] which relieved the Department of the obligation to enact mitigation measures under the fourth requirement for Section 402 compliance.

Appellants argue the Department's process for complying with Section 402 was not reasonable because as part of the process for gathering and analyzing how the new base may impact the dugong, the Department did not consult with Appellants directly, consult directly with the local community, seek public comment, or consult on how the new base would impact the cultural significance of the dugong. We disagree and find the Department's process for complying with Section 402 was reasonable, and that the Department was not required to engage in the additional process Appellants seek.

### a. Direct Consultation with Appellants and Local Community Members

Because the Department was not required to consult any specific organization, individual and/or entity under Section 402, we consider only whether it was reasonable for the Department not to consult Appellants and local community members. We conclude that it was.

Although Appellants have certainly demonstrated an interest in the dugong, Appellants have provided no evidence that had the Department consulted them, they would have contributed information material to the Department's "take into account" analysis. The evidence

---

[8] Whether this determination was supported by substantial evidence is discussed below.

that Appellants cite, i.e., the Declarations of Anna Koshiishi and Takuma Higashionna, is largely irrelevant.  The declarations were submitted seven years before the Department conducted its "take into account" process. Additionally, the Department noted that it had considered the declarations submitted by Appellants in the litigation as a part of its "take into account" process, which would have presumably included these declarations, among others.  2014 USMC Findings, § 2.1.

While Appellants are correct that the Department did not directly consult local community members or practitioners to whom the dugong was culturally and spiritually significant, the Department did obtain such information indirectly. One such source was Appellants' own expert, Mr. Isshu Maeda, who "conducted extensive research both in literature and in the field on the role of the dugong in folklore and ritual," among other cultural experts.  Welch Report at p.9.  The Department also obtained information indirectly from other interviewees who had talked to cultural practitioners "to whom the interview team could not get access and had information regarding rituals and other cultural practices that [had] never been published." *Id*. at pp. 10–11.

No evidence suggests that the information obtained from these indirect sources was incomplete or inaccurate. *Cf. Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (rejecting an argument that the DOI's failure to consult timely with plaintiffs violated Section 106 because  plaintiffs "[did] not identify any new information that [the Native American Tribe] would have brought to the attention of the [Bureau of Land Management] had it been consulted earlier in the approval process," and "fail[ed] to show or even argue that early

consultation would have prevented any adverse effect . . .").**9** Therefore, while it would have been preferable to Appellants for the Department to have consulted directly with local community members or practitioners, the Department's decision to obtain the same information indirectly, through its other interviewees, was not unreasonable.

### b.  Public Participation

We also conclude that the Department's decision not to provide public notice and comment on its "take into account" process was reasonable.  As we have held, Section 402 does not require direct public participation in the "take into account" process.  Additionally, here, public notice and comment occurred in connection with the Japanese EIS/EIA, which the Department considered as part of its overall process.**10**

---

**9** Appellants make a passing argument that the Department failed to consult with the Okinawan government during the "take into account" process.  This contention is unpersuasive.  The April 2018 letter from Okinawa Governor Onaga to Secretary Mattis, referenced by Appellants, was sent four years *after* the Department completed the "take into account" process.  Additionally, the then-governor of Okinawa participated in the EIS process, submitting extensive comments.

**10** Our discussion of the public notice and comment undertaken by the Japanese government as part of producing its EIS/EIA should not be understood as a holding that a U.S. federal agency is not required to conduct notice and comment to comply with Section 402 only when the host country has conducted its own notice and comment process.  As we have held, Section 402 does not mandate direct public participation in the approval process, and a decision to forgo notice and comment will be upheld if the decision was reasonable under the circumstances. Our discussion of the Japanese notice and comment period serves to highlight the reasonableness of the Department's decision here not to engage in

Appellants challenge the adequacy of the Japanese EIS/EIA.  They contend that the Japanese EIS process was inadequate because the Japanese EIS did not analyze the effect of the new base on the dugong's cultural significance, only its biological impact on the dugong; and there was no public comment on the final EIS or the proposed mitigation measures.

These challenges are largely meritless.  The record shows that the Japanese EIS process included public comment before and after the final EIS.  Additionally, even if there was no period of public comment on the mitigation measures, Appellants do not explain how the absence of that period of public comment would have affected the EIS's ultimate conclusions.  *See Te-Moak Tribe*, 608 F.3d at 609.

Furthermore, while Appellants are correct that the Japanese EIS measured the biological impact of the new base on the dugong, there is no evidence that Appellants were precluded from commenting on the dugong's cultural significance had they chosen to participate in the EIS's periods of public notice and comment.  Moreover, the new base's biological impact on the dugong is also tied to its impact on the dugong's cultural significance.  As explained in the Welch Report, "[t]he most likely cultural impacts of the [new base] [on the dugong] will be indirect . . . and will stem from the *biological harm* that might be done to the dugong population as a result of construction and use of the [new base] in an area where dugongs feed (or at least fed in the past)."  Welch Report at p.92 (emphasis added); *see id*. ("Thus, our conclusion, based on this study, is that the disappearance of the dugong population from Okinawa

---

additional public notice and comment in the face of Appellants' challenge.

would have an adverse cultural impact. Thus, biological conservation and management to help preserve and protect the species . . . are related directly to cultural protection of the dugong.").

### c. Consultation With Entities Regarding the Effect of the New Base on the Cultural Significance of the Dugong

Appellants argue that the Department failed to consult with entities regarding the effect of the new base on the dugong's cultural significance. We conclude that the Department's decision not to consult these entities was reasonable under the circumstances.

Contrary to Appellants' contentions, notwithstanding the Welch Report's failure to disclose the purpose of the study to the interviewees, the Welch Report made findings regarding the cultural impacts of the new base on the dugong. Specifically, it found that while the new base should have "little direct adverse impact on the cultural significance of the dugong or on traditional cultural practices associated with the dugong," the new base would have a "direct impact[]" on the dugong's bed, Jangusanumii, seagrass beds in the vicinity of Henoko Village. Welch Report at p.91. It, however, concluded that the "project research found no indication" of any "culturally important activities" being conducted in or associated with that area. *Id.*

### B. The Department's Finding of No Adverse Effect

Appellants contend that the Department's finding that the new base would have no adverse effect on the dugong was arbitrary, capricious, and contrary to law because the

Department did not have the baseline biological data to make a reliable determination of the effects of the new base on the dugong and did not consider the full range of impacts of the new base on the dugong. Appellants also contend that the finding is contradicted by the evidence in the record. We disagree.

### 1.   Legal Standard

Under Section 706 of the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"The arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). "Where the agency has relied on relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion, its decision is supported by substantial evidence," and this court must affirm the agency's finding. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citation and internal quotation marks omitted). "Even [i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings." *Id.* (citation and internal quotation marks omitted).

Although the deference owed to an agency is neither "unlimited" nor "automatic[]," *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 994, a reviewing court will "strike down agency action as arbitrary and capricious [only] if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or made a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Turtle Island Restoration Network*, 878 F.3d at 732–33 (citation and internal quotation marks omitted) (alteration added).

## 2. Analysis

### a. Baseline Dugong Population Data

Appellants are correct that the Department lacked robust baseline population data for the dugong population in Okinawa. *See* 2014 USMC Findings, § 3.1 (commenting that the available "data [is] not sufficient to establish population size, status, and viability" of the dugong population in Okinawa); *id.*, § 3.4 (noting the "absence of recent total population data" for the Okinawa dugong and finding it would be beneficial for the Japanese government "to conduct new systematic surveys or modeling using methods currently accepted by marine mammal biologists to confirm current estimates about the overall size and status of the dugong population in Okinawa and the viability of a population of this size").

Indeed, as Appellants point out, the Department's own researchers criticized the lack of robust dugong population data in its own studies and the Japanese EIS. *See* July 28, 2011 e-mail from a SuMMO researcher (recommending "a targeted dugong monitoring project in [a] more rigorous manner" and discouraging "using data from the currently designed project to make legally defensible claims regarding

the presence or absence of dugongs");[11] March 22, 2010 e-mail from Dr. Jefferson (criticizing the Japanese EIA as "extremely poorly-done" and "not withstanding scientific scrutiny"); Welch Report at p.95 (critiquing the Japanese EIS, and observing that without more robust data, "it [would] be difficult to impossible to assess the potential adverse effects of the [new base], develop appropriate mitigation measures, and evaluate the success of mitigation measures"); Jefferson Report at p.17 (recommending a "better understanding of the current status of the dugong population . . . in order to understand what impacts might be expected from the construction of the [new base]").

But these criticisms do not demonstrate that the Department's analysis was fundamentally "flawed." *See Ctr. for Biological Diversity*, 833 F.3d at 1148; *River Runners for Wilderness*, 593 F.3d at 1070 (there need only be a "rational connection between the facts found and the choices made" to support an agency's decision) (internal quotation marks omitted). Baseline population data, although preferable, is "not an independent legal requirement." *Ore. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) (citation and internal quotation marks omitted).

Here, substantial evidence supports the Department's conclusion that the presence of the dugong in the area of the new base was sporadic, even if it did not possess more robust baseline population data. The Department's baseline population data suggested only a "remnant population" of Okinawa dugongs, ranging from 3 to 50 individuals. 2014 USMC Findings, § 3.1; *see also* Jefferson Report at p.17

---

[11] The Department appears to have not relied on the data in the SuMMO Report to support its findings.

(opining that "[a]lthough no reliable abundance estimates exist, the [dugong] population [in Okinawa] is believed to number less than 50 individuals").

Additionally, the monthly survey data showed only sporadic or intermittent dugong activity in the area of the new base (the Henoko and Oura Bays). During four years of monthly surveys from 2009 to 2013, dugong feeding trails were observed in the new base site and the area immediately adjacent to the new base site only on seven occasions, in June 2009, August 2009, April 2012, May 2012, March 2013, May 2013, and November 2013. 2014 USMC Findings, § 2.4. Also, only one dugong was photographed in the new base area. *Id.* By contrast, the monthly survey data demonstrated "routine dugong activity," including dugong sightings and feedings trails, off Kayo, which is between 2 and 3 miles northeast the new base. *Id.*

*Oregon Natural Desert Association*, relied on by Appellants, is factually inapposite. In *Oregon Natural Desert Association*, the Bureau of Land Management approved an environmental impact statement for a wind-energy project that was located on land that provided potential winter foraging habitats for the sage grouse. 840 F.3d at 567. In approving the environmental impact statement, the Bureau did not conduct surveys to determine if sage grouse were present at the project during the winter months, but instead, "assumed" that the sage grouse were not present based on surveys done at neighboring sites, which the Bureau mistakenly interpreted as showing the absence of the sage grouse. *Id.* This court held the Bureau's review "did not adequately assess baseline sage grouse numbers during winter" at the project site, because, contrary to the environmental impact statement, the data showed that there were, in fact, sage grouse present in one of the neighboring

sites during the winter months, so the Bureau's data extrapolation was arbitrary and capricious. *Id*. at 564; *see also id*. at 569–70.

By contrast, the Department reviewed dugong survey data covering the new base, as well as the neighboring, unaffected areas (Kayo). Based on the limited presence of the dugong in the new base site area, the Department reasonably concluded that the dugong's presence was sporadic and intermittent, at best, and, as a result, that there would be no adverse effects on the dugong as a result of the new base.

### b. Full Range of Impacts of the New Base on the Dugong

Appellants argue that the Department failed to consider population fragmentation, disruption of travel routes, and the loss of habitat required to sustain the population, in evaluating the impacts of the new base on the dugong.

While Appellants are correct that the Department did not specifically consider population fragmentation and the disruption of travel routes, there was no data suggesting that the construction and operation of the new base would further fragment the dugong population or interfere with existing dugong travel routes to their habitats and/or potential feeding groups. Accordingly, the Department's failure to consider these factors was not unreasonable.

Regarding the loss of habitat, the Welch Report and the 2014 USMC Findings identified the loss of certain seagrass beds in Henoko and Oura Bays, which were a potential natural habitat and food source for the dugong, as a result of land reclamation due to the construction of the new base. 2014 USMC Findings, § 3.2.2; Welch Report at p.96. The

Department, however, concluded that the loss of these seagrass beds would not adversely impact the dugong "because these seagrass beds [were] not consistently or routinely used by resident dugong and there [were] other seagrass beds" that could maintain the dugong population. 2014 USMC Findings, § 3.2.2. Substantial evidence exists to support that conclusion. The monthly survey data demonstrated that the dugong's regular feeding trails were in Kayo, not in the Henoko or Oura Bays. 2014 USMC Findings, § 2.4. Moreover, as the Department noted in the 2014 USMC Findings, the Japanese government had already committed to monitoring the seagrass beds and to expanding the seagrass habitat. 2014 USMC Findings, § 2.3.

Although the Department could have addressed these factors more explicitly and obtained additional data, we cannot say that its failure to do so renders its ultimate finding arbitrary, capricious, or contrary to law. *See Ctr. for Biological Diversity*, 833 F.3d at 1148 (explaining that while plaintiff "could demonstrate persuasively numerous ways in which [the Bureau's] emissions analysis could be improved," "[m]ere differences in opinion, however, are not sufficient grounds for rejecting the analysis of [the agency]").

### c.  The Record Evidence

The Department conducted extensive research on the effect of the new base on the dugong, including, but not limited to, studies commissioned on the biological and cultural assessment of the dugong, *see generally* Welch Report and Jefferson Report; all available survey data on the dugong population in Okinawa, the area of the new base, and the neighboring areas, *see generally* Draft Japanese EIS/EIA; field work including visits to cultural museums, the Okinawa Prefecture Board of Education, and

interviewing cultural experts, *see* Welch Report at pp. 8–9; and the Japanese EIS/EIA which assessed the likelihood of the adverse impact of the construction and operation of the new base on the dugong. Based on these studies, interviews, and field work, the Department rationally concluded that the construction and operation of the new base would not adversely impact the dugong population, and would have no adverse effect on the dugong's cultural significance.[12]

Appellants' contentions that the Department's finding is contradicted by the record evidence, including the Welch Report, the Department's own findings, and the inadequacy of the mitigation efforts, are largely unsupported.[13]

For example, the Welch Report concluded that notwithstanding its conclusion, the mostly likely cultural impacts on the dugong would stem from biological harm, and that there was "reason to believe that the construction of [the new base could] proceed without having an overall adverse impact" on the Okinawa dugong with a "well-planned approach that involve[d] cultural sensitivity, adaptive management and state-of-the-art biological monitoring, and cooperation with the Japanese and Okinawan governments." Welch Report at p.92.[14]

---

[12] But, regarding the dugong rituals performed in Henoko Village, the Department conceded that it was unable to assess the impact of the new base on these rituals given their secretive nature. 2014 USMC Findings, § 3.5.

[13] We do not address all of Appellants' contentions here, and focus instead on what appear to be Appellants' main contentions.

[14] Appellants also cite to dugong population data from the 2000 to 2003 time period, and ignore more recent survey results that show a

Additionally, Appellants' contention that dugongs would be harmed during construction by noise, vibration, and light "*if* they enter[ed] Oura Bay," (emphasis added), discloses only a contingent and potential harm, not the likelihood of these harms occurring. Given the dugong's sporadic presence in the Oura Bay and the "extremely low probability" of dugong activity in the area of the new base, the Department rationally concluded that there would be no adverse effects on the dugong from the construction and the operation of the new base.

Finally, the fact that the mitigation measures "presuppose[]" the potential for adverse impact is not fatal to the Department's ultimate finding. As discussed above, there was substantial evidence to support the Department's finding, apart from the mitigation measures.

## IV.    Conclusion

For the reasons discussed above, we affirm the district court's grant of summary judgment to the Department.

**AFFIRMED.**

---

sporadic dugong presence in the Henoko and Oura Bays, which supports the Department's conclusion that there was an "extremely low probability" of dugongs in the area of the new base.

BEA, Circuit Judge, concurring:

The majority is correct that the Department of Defense ("the Department") complied with the National Historic Preservation Act ("NHPA") Section 402 procedural requirements and that its finding the new base in Okinawa would not adversely impact the dugong population was not arbitrary and capricious. For these reasons, apart from footnote 2, I join the majority opinion in full.

I write separately, however, because I believe that rather than expounding the requirements for Section 402 compliance and then evaluating the Department's procedures in light of the standard, a better resolution of the case would have addressed the antecedent question: In constructing the new base in Okinawa, was the Department even bound by Section 402?  Because, in my view, the answer to that question is no, I would affirm the judgment of the district court, but do so on the grounds that the Department was not subject to the procedural requirements of Section 402.

**I**

Early in the litigation, the Department filed a motion to dismiss (later converted into a motion for summary judgment) in which it argued Section 402, which creates procedural requirements for overseas projects that "adversely affect a property that is . . . on the applicable country's equivalent of the National Register [of Historic Places]," did not apply to its new base because Japan's Law for the Protection of Cultural Properties was not the "equivalent of the National Register" and because the dugong was not "property." 54 U.S.C. § 307101(e). The district court disagreed and denied the motion. *Dugong v. Rumsfeld*, No. C 03-4350 MHP, 2005 WL 522106, at *8, 12

(N.D. Cal. Mar. 2, 2005) ("2005 order"). Litigation continued, and in 2015, the district court entered final judgment in the Department's favor after finding the court lacked subject matter jurisdiction over the Center for Biological Diversity's ("CBD") claims based on the political question doctrine and a lack of standing. *Ctr. for Biological Diversity v. Hagel*, 80 F. Supp. 3d 991, 1019 (N.D. Cal. 2015). CBD appealed that judgment, which we reversed and remanded to the district court. *Ctr. for Biological Diversity v. Mattis* (*CBD I*), 868 F.3d 803, 830 (9th Cir. 2017).

Before we considered the merits of CBD's appeal of that final judgment, however, the Department filed a timely notice of cross-appeal stating it intended to challenge prior orders from the district court that preceded the final judgment. One of those orders was the 2005 order finding the dugong was covered by Section 402. The following month, before briefing began, the Department voluntarily dismissed its cross-appeal. Later, in its answering brief to CBD's initial appeal, the Department reiterated "its continuing objection" to the district court's 2005 order, but it did not ask us to sustain the judgment in its favor on the ground that the 2005 order was wrongly decided. *See CBD I*, 868 F.3d at 822 n.7. We endorsed the Department's decision to restrict its arguments to the issues of standing and the political question doctrine and proceeded on the assumption that the 2005 order was correct, without addressing the issue. However, at the same time we noted the Department reserved "the right to move for reconsideration or further appellate review" of the 2005 order "[s]ubject to any waiver considerations." *See id.*

On remand, the district court again entered judgment for the Department, this time after finding that the Department had complied with Section 402's procedural requirements

and further finding its determination that there would be no adverse impacts on the dugong was not arbitrary and capricious. *Okinawa Dugong v. Mattis*, 330 F. Supp. 3d 1167, 1197–98 (N.D. Cal. 2018) ("2018 order"). Following this judgment, CBD again filed a notice of appeal. This is the matter we decide today. This time the Department did not file a cross-appeal, but in its answering brief, the Department's primary argument is that we should sustain the district court's judgment in its favor, not on the reasoning in the district court's 2018 order, but on the grounds that the 2005 order was wrongly decided. Rather than viewing the Department's argument as a simple request for affirmance on an alternative rationale, the majority believes that the Department is advancing an unnoticed cross-appeal that we may not consider. *See* Majority Op. at 2 n.2. Therefore, it bypasses the issue and affirms the district court's judgment on the rationale that the district court put forth in the 2018 order.

I believe the majority is incorrect that, by arguing the 2005 order was wrongly decided, the Department is making an unnoticed cross-appeal, and I believe the Department is right on the merits of that argument. Because whether the 2005 order was correct that Section 402 applies to the dugong is a threshold issue required to be addressed before we can decide whether the Department acted in conformity with Section 402 and the Administrative Procedure Act, I would resolve the case by holding that the district court erred by concluding, as a matter of law, that Section 402 applies to the dugong and affirm the judgment in favor of the Department on that ground.

## II

We review, not a lower court's opinion or reasoning, but its judgment. *Jennings v. Stephens*, 574 U.S. 271, 277

(2015). For this reason, it is well-established that we may affirm a district court's judgment on any grounds supported by the record. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 974 (9th Cir. 2017). An appellee does not need to file a notice of cross-appeal to seek affirmance on an alternative ground, but if he does not raise the alternative theory in his answering brief, the argument usually is waived. *United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015) (en banc). And though an appellee who does not cross-appeal may urge affirmance on any ground in the record, he may not "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) (quoting *United States v. American Railway Express Co.*, 265 U.S. 425, 435 (1924)). Whether affirming a judgment on alternative grounds impermissibly impacts the rights of a party is measured against the party's "rights under the judgment," not against the effect the alternative rationale may have on future litigation. *Jennings*, 574 U.S. at 276; *id.* at 278 ("[M]aking alteration of issue-preclusive effects the touchstone of necessity for cross-appeal would require cross-appeal for *every* defense of a judgment on alternative grounds."). If the appellee's theory would enlarge his own rights under the judgment, or diminish the appellant's, only then must a cross-appeal must be taken.

CBD's argument that the Department's attack on the 2005 order requires a cross-appeal is primarily premised on CBD's belief that sustaining the district court's judgment on the reasoning that Section 402 does not apply to the dugong would lessen CBD's rights. However, CBD had no "rights under the judgment" that was totally in the Department's favor. *Jennings*, 574 U.S. at 276. This is all the more clear given today's decision affirming the district court on the

rationale given in its 2018 order, whereby CBD continues to have no rights stemming from this case, and therefore no rights that could be impacted by affirming the judgment on alternative grounds. What CBD is really trying to avoid by arguing the Department is pursuing an unnoticed cross-appeal is an adverse precedential decision that could preclude CBD from arguing in a future case (at least in this Circuit) that Section 402 protects animals. But an affirmance on this rationale would not impact CBD's rights under the current judgment, even if it prevented CBD from successfully advancing its legal theory in a future case. The Supreme Court already rejected a similar, and stronger, argument that a notice of cross-appeal was required in *Jennings* when it held that affirming a judgment on an alternative theory that makes the issue preclusive effect of the judgment more favorable to the appellee, but does not affect the scope of the judgment, does not require the appellee to notice a cross-appeal. *Id.* at 278.

Of course, because we may affirm the district court on any grounds supported by the record, we are not obligated to address the Department's arguments regarding the 2005 order. Although I disagree with the majority that the Department needed to file a notice of cross-appeal if it wanted us to consider the 2005 order, the majority ultimately commits no legal error by declining to address the issue. But I find any prudential rationale for sidestepping the question lacking. To begin, that the challenged order is 15 years old is of little consequence. The denial of the Department's motion for summary judgment in 2005 was not immediately appealable. S*ee* 28 U.S.C. § 1291. The first opportunity for review of the 2005 order was during the appeal of the initial entry of judgment for the Department, which we reversed in 2017. *See CBD I*, 868 F.3d at 830. In that litigation the Department did initially file a cross-appeal stating it

intended to challenge the 2005 order, which it later voluntarily dismissed. Even after dismissing that cross-appeal, the Department again noted its objection to the 2005 order in its answering brief, though it did not seek affirmance on that ground. But just because the Department previously filed an unnecessary notice of cross-appeal, it is not required to do so again. In *CBD I*, though the Department ultimately restricted its arguments to standing and political question issues, it did preserve the argument that the 2005 order had been wrongly decided. We endorsed that decision then, and now, with the question properly presented and serving as a predicate issue to the adequacy of the Department's Section 402 compliance, we should address it.

### III

In 2005 the district court erred when it found that Section 402 applied to the dugong, and I would resolve this case by affirming the judgment in the Department's favor under the reasoning that the dugong is not "property" covered by Section 402.

Section 402 reads:

> Prior to the approval of any undertaking outside the United States that may directly and adversely affect a *property* that is on the World Heritage List or on *the applicable country's equivalent of the National Register [of Historic Places]*, the head of a Federal agency having direct or indirect jurisdiction over the undertaking shall take into account the effect of the undertaking on the property for purposes of avoiding or mitigating any adverse effect.

54 U.S.C. § 307101(e) (emphasis added). The statute provides no specific definition for "property" nor guidance on what defines a "country's equivalent of the National Register." In this case, the dugong is listed for protection under Japan's Law for the Protection of Cultural Property. For Section 402 to apply to the dugong, the Law for the Protection of Cultural Property must be Japan's equivalent of the National Register, and the dugong must be property as the term is used in Section 402.

First, I believe that the Law for the Protection of Cultural Property is the equivalent of the National Register. The purpose of the Law for the Protection of Cultural Property is "to preserve and utilize cultural properties, so that the culture of the Japanese people may be furthered and a contribution made to the evolution of world culture." Law for the Protection of Cultural Property, art. 1 (2003), *translated by* Agency for Cultural Affairs, Government of Japan ("LPCP"). Likewise, the National Historic Preservation Act, which established the National Register of Historic Places, has the aim "to foster conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations." 54 U.S.C. § 300101. Both laws allow for the official designation of certain properties and require actions to ensure preservation of the designated properties. The key difference that is relevant here is that Japan's law allows for the protection of greater types of property—such as customs and animals—than the National Register of Historic Places, which is limited to "districts, sites, buildings, structures, and objects." 54 U.S.C. § 302101. However, Japan's list of cultural properties also includes these same categories of property. *See* LPCP art. 2. Questions raised by items on Japan's list of protected properties that go beyond those eligible for

inclusion on the National Register, like the dugong, are better conceptualized as issues of whether those items are "property" as defined in Section 402, not whether Japan's list is equivalent to the National Register.

As to whether a dugong is "property" as the term is used in Section 402, I would hold that it is not, and that "property" protected by Section 402 is limited to a "district, site, building, structure, or object," 54 U.S.C. § 300308, or to items that meet the definition of "cultural heritage"[1] or "natural heritage"[2] as the terms are defined in the United

---

[1] For the purpose of this Convention, the following shall be considered as "cultural heritage":

> monuments: architectural works, works of monumental sculpture and painting, elements or structures of an archaeological nature, inscriptions, cave dwellings and combinations of features, which are of outstanding universal value from the point of view of history, art or science;
>
> groups of buildings: groups of separate or connected buildings which, because of their architecture, their homogeneity or their place in the landscape, are of outstanding universal value from the point of view of history, art or science;
>
> sites: works of man or the combined works of nature and man, and areas including archaeological sites which are of outstanding universal value from the historical, aesthetic, ethnological or anthropological point of view.

World Heritage Convention art. 1.

[2] For the purposes of this Convention, the following shall be considered as "natural heritage":

Nations World Heritage Convention, *see* Convention Concerning the Protection of the World Cultural and Natural Heritage, arts. 1–2, Nov. 16, 1972, 1037 U.N.T.S. 151. The first part of this definition of "property" in Section 402—a "district, site, building, structure, or object"—is derived from the statutory definition of "historic property" in the NHPA[3] that was enacted at the same time as Section 402. *See* Pub. L. 96-515, §§ 402, 501, 94 Stat. 2987, 3000–01 (1980). The second part of the definition of "property" in Section 402—items that meet the World Heritage Convention definitions for "cultural heritage" or "natural heritage,"—results from the enactment of Section 402 to further "participation by the United States in the World Heritage Convention." 54 U.S.C. § 307101(b). The alternative to limiting the definition of "property" in the

> natural features consisting of physical and biological formations or groups of such formations, which are of outstanding universal value from the aesthetic or scientific point of view;
>
> geological and physiographical formations and precisely delineated areas which constitute the habitat of threatened species of animals and plants of outstanding universal value from the point of view of science or conservation;
>
> natural sites or precisely delineated natural areas of outstanding universal value from the point of view of science, conservation or natural beauty.

World Heritage Convention art. 2.

[3] "In this division, the term 'historic property' means any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308.

manner above is that *all* items included for protection on *any* country's equivalent of the National Register receive protection under Section 402. *See Dugong*, 2005 WL 522106, at *8; Emily Monteith, Note, *Lost in Translation: Discerning the International Equivalent of the National Register of Historic Places*, 59 DePaul L. Rev. 1017, 1051 (2010). Such a broad definition would go well beyond ensuring "participation by the United States in the World Heritage Convention" and beyond extending NHPA-type protection extraterritorially. 54 U.S.C. § 307101(b). Therefore, I do not read any ambiguity over the definition of "property" in Section 402 as exceeding the scope of property protected by the World Heritage Convention and the NHPA, or as delegating the definition to various foreign laws.

Applying this definition of "property" to Section 402, the dugong is not covered. This is because both the NHPA and the World Heritage Convention limit protection to specific locations and to tangible, inanimate objects. In its 2005 order, the district court found that the dugong was an "object" as the term was used in the NHPA, but this was in error. *See Dugong*, 2005 WL 522106, at *9–10. Applying *noscitur a sociis*, "object," as part of a list containing "district, site, building, [and] structure," does not include animals. *See* 54 U.S.C. § 300308. Although Department of Interior regulations defining an "object" define it as "a material thing," and are not explicit that material things do not include animals, the examples the regulation provides are all inanimate objects. *See* 36 C.F.R. § 60.3(j). That the NHPA definition of "object" excludes animals is all the clearer considering there are no animals or wildlife listed on

the National Register of Historic Places.**[4]** Likewise, the World Heritage Convention does not include animals as eligible for inclusion on the World Heritage List as either cultural heritage or natural heritage. *See* World Heritage Convention arts. 1–2. The definition of "natural heritage" eligible for inclusion on the World Heritage List includes "*precisely delineated areas* which constitute the habitat of threatened species of animals" but does not allow for the protection of specific animals wherever they may be. *Id.* art. 2 (emphasis added).

Because Section 402's definition of "property" does not include animals, the district court's decision to the contrary misstated the law, and the Department was entitled to judgment in its favor resulting from its 2005 motion for summary judgment. Eventually, the district court correctly entered judgment for the Department in 2018, after it found the Department complied with Section 402. I would affirm the district court's judgment but do so on the ground that Section 402 does not apply to the dugong as a matter of law.

---

**[4]** In some instances, trees or groups of trees are listed on the National Register, but one clear difference between a tree and an animal is that a tree may constitute a "site," while an animal may not.